U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

U.S. DISTRICT COURT
FOR THE DISTRICT OF VERMONT

2004 SEP 23  PM 5 00

BY _____
DEPUTY CLERK

2:04-cv-245

Vermont Protection and Advocacy, Inc.
Plaintiff

v.

Steve Gold, Commissioner
In his Official Capacity;
State of Vermont Department of Corrections
 Defendants

**JURY DEMAND**

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### Introduction

1. Vermont Protection and Advocacy, Inc. (VP&A) brings this lawsuit against the
   Vermont Department of Corrections (DOC) and Steve Gold, Commissioner of
   the Department of Corrections, in an effort to halt the inhumane policy of
   punishing inmates with disabilities for self-harming behavior which the
   Vermont Department of Corrections has applied in the past and continues to
   apply as of the date of this lawsuit.  For over a year, through a variety of
   means, VP&A has provided detailed information to the Defendants describing
   the effects of this offensive policy. Further, VP&A has provided expert
   psychiatric opinion regarding the unacceptable and counter-therapeutic
   consequences that the policy of punishing inmates with disabilities who
   commit acts of self-harm, usually by segregation, pepper spray, and loss of

Vermont Protection
& Advocacy, Inc.
141 Main St.Suite 7
Montpelier, VT 05602

privileges, inflicts on these individuals. As stated by the Correctional Association of New York in its October 2003 publication <u>Lockdown New York: Disciplinary Confinement in New York State Prisons</u>, page 32, "to punish individuals in such desperate straits can only be described as cruel and misguided." The Defendants' failure to address and remedy this policy, despite VP&A's repeated efforts and the obvious harm caused to VP&A's constituents, is the reason for the instant lawsuit.

2.  This is an action brought pursuant to 42 U.S.C. §§1983 and 10801 et. seq., by Plaintiff Vermont Protection and Advocacy, Inc. (VP&A), on behalf of its constituents who are individuals with disabilities incarcerated within Defendants' so-called "correctional facilities."

3.  This action alleges that by knowingly providing a mental health treatment system that fails to provide appropriate protections and treatment to individual inmates with self-harming behaviors and/or need for trauma-based treatment, and by punishing these same inmates for their disability-related self-harming behaviors, the Defendants have caused, continue to cause, and will in the future cause, unnecessary emotional and physical harm to Plaintiff's constituents. The Defendants are thus subjecting Plaintiff's constituents to conditions that constitute cruel and unusual punishment in violation of the Eighth Amendment to the Constitution of the United States; and in violation of Plaintiff's constituent's rights

Vermont Protection
& Advocacy, Inc.
141 Main St.Suite 7
Montpelier, VT 05602

under Chapter 1, Article 10 of the Vermont State Constitution; and that Defendants are denying adequate mental health treatment and supports to Plaintiff's constituents in violation of Plaintiff's constituent's rights under 42 U.S.C. § 1983; 42 U.S.C. § 12132 and 28 V.S.A. § 801.   Plaintiff has no other adequate remedy at law to prevent these harms and Constitutional violations other than requesting the instant Injunction and Declaratory Relief.

## JURISDICTION

4.   This Court has jurisdiction of this action pursuant to 28 U.S.C. §§1331, 1343(a)(3)-(4), 2201 and 42 U.S.C.§12133.

## VENUE

5.   This Court is the proper venue for this action pursuant to 28 U.S.C. §1391(b) because the claims arise within the District and the events and omissions giving rise to Plaintiff's claims occurred in this District.

## EXHAUSTION OF REMEDIES

6.   This action is instituted to prevent or eliminate imminent serious physical and emotional harm to Plaintiff's constituents.  Plaintiff VP&A is not required to exhaust administrative remedies in this case pursuant to 42 U.S.C. § 10807(b). In addition, Plaintiff has at least one constituent, Inmate Jane Doe, who has exhausted all available administrative remedies regarding the instant claims. Finally, Plaintiff has pursued both informal and formal negotiations for over a year with Defendants requesting improvements in aspects of their mental health system complained of herein, but with no success at preventing the harms identified in the instant pleading.

## PARTIES

7.   Plaintiff VP&A is the federally authorized and funded law office established

Vermont Protection
& Advocacy, Inc.
141 Main St.Suite 7
Montpelier, VT 05602

3

under the Protection and Advocacy of Mentally Ill Individuals Act of 1986 (PAIMI), 42 U.S.C.§10801 et. seq.  Plaintiff VP&A represents the rights of people with disabilities, including mentally ill individuals, within so-called "correctional facilities".  Inmate Jane Doe is one of VP&A's constituents, has exhausted all administrative remedies regarding her complaint against the DOC policy of punishing self-harming disabled inmates, and has requested that VP&A bring this suit on her behalf and on behalf of other similarly situated inmates who are also clients or potential clients of Plaintiff.

8.  Defendant Steve Gold is the Commissioner of the Vermont Department of Corrections and as such, he is the legal custodian of all prisoners sentenced in the State of Vermont, and is responsible for their safe, secure and humane housing, and for providing adequate medical and mental health care for those prisoners.  At all times relevant hereto, he has acted under the color of state law.  Defendant Gold is sued in his official capacity.

9.   Defendant Department of Corrections is the entity authorized by the State of Vermont to be the custodian for all individuals sentenced to its custody, detained by order of a court in its custody, or held for other reasons pursuant to law within a "correctional facility."

<u>FACTS</u>

10.  There are numerous instances of Plaintiff's constituents being pepper sprayed, assaulted, isolated, restrained, held naked or barely clothed, and loosing various privileges, including liberty, visitation and programming, based on self-harming behavior related to their disabilities for which they did not receive adequate treatment.

Vermont Protection
& Advocacy, Inc.
141 Main St.Suite 7
Montpelier, VT 05602

4

11. Several of Plaintiff's constituents have injured themselves repeatedly due to the Defendants' failure to provide an appropriate environment and adequate treatment or to transfer the individual to a facility that could provide adequate treatment.

12. Plaintiff VP&A has filed grievances in accordance with the Defendants' policies on behalf of these inmates with disabilities within Defendants' custody and control regarding inadequate mental health care and punishment of inmates with disabilities for self-harming behavior.

13. In the vast majority of instances where Plaintiff has filed grievances on behalf of its inmate constituents Defendants have violated their own policies and failed to adequately, timely, or substantially respond to those grievances.

14. In one case the grievance was denied despite clear DOC documentation that the complained of event (assault by officer while inmate with a disability was in restraints after a self-harming episode) actually did occur.

15. In another case, one of Plaintiff's constituents was shackled to a bed for more than a week without adequate mental health treatment or supervision apparently because of his self-harming behavior.

16. Regarding the facts alleged in Paragraph 15, Defendants were unable to provide documentation or evidence demonstrating that the disabled individual received appropriate mental health care and supervision during the time he was tied down to the bed, nor could the exact amount of time the individual was restrained or the manner in which he was restrained be determined, because of the Defendants' lack of documentation.

17. Inmate Jane Doe, one of Plaintiff's constituents, was not provided with

Vermont Protection
& Advocacy, Inc.
141 Main St. Suite 7
Montpelier, VT 05602

5

adequate mental health treatment while incarcerated and filed a grievance about that situation.

18. Inmate Jane Doe did not receive additional support or treatment after filing her grievance.

19. After filing her grievance, Inmate Jane Doe harmed herself by slashing her throat in the prison shower.  She was found guilty of a disciplinary rule violation for this behavior and punished with time in segregation.

20. The facility superintendent later struck inmate Jane Doe's disciplinary rule violation from her record because no mental health provider intervened and none of her witnesses were called during the disciplinary proceedings.

21. No compensation was provided to Inmate Jane Doe for the days she wrongly spent in segregation and the policy of punishing disabled inmates who harm themselves was not amended nor stricken by Defendants.

22. The Defendant assigned Dr. Cotton to deal with Inmate Jane Doe's original grievance regarding the lack of mental health treatment before her self-harming episode despite the fact that it was his negligence complained of by inmate Jane Doe. DOC violated its own policy when it assigned Dr. Cotton to investigate inmate Jane Doe's complaint.

23. Starting in February of 2002 and up to the present, Defendants were made aware of allegations of substandard mental health treatment for inmates with mental illness by formal grievances filed by Plaintiff on behalf inmates with disabilities.

Vermont Protection
& Advocacy, Inc.
141 Main St.Suite 7
Montpelier, VT 05602

6

24. In July 2003, Plaintiff VP&A met with representatives from Matrix (the mental health provider for DOC at that time) to discuss concerns about substandard mental health treatment within the DOC. VP&A provided Defendants with a list of 11 quality assurance criteria intended to assist the Defendants in recognizing the serious problems and harms their mental health system was causing VP&A constituents and other inmates. This list included a specific request that the Defendants focus on the problem of punishing inmates with disabilities who self-harm.

25. Defendants implied that they would evaluate the proposed July 2003 quality assurance criteria in an effort to improve mental health services for Vermont inmates.

26. No formal, credible evaluation, analysis, or data gathering relevant to the July VP&A quality assurance criteria was or has been provided by DOC or its Mental Health provider to VP&A, inmates or other interested parties by the Defendants.

27. In August, 2003, Defendants received the report of Dr. Jeffrey Metzner, a nationally recognized prison mental health expert hired by the Defendants. Dr. Metzner's report identified several areas where DOC's mental health contractors failed to provide adequate mental health treatment and related services including inadequate mental health services for inmates subject to restraint for self-harming behaviors.

28. The Defendants are unable to identify when they received the report from Dr. Metzner, which is dated August 2003.

29. The Defendants have neither remedied the problems identified by Dr. Metzner generally nor specifically addressed the appropriate interventions that mental

Vermont Protection
& Advocacy, Inc.
141 Main St.Suite 7
Montpelier, VT 05602

health and correctional staff should provide to an inmate with a disability rather than punishing them for self-harming behavior.

30. Dr. Paul Cotton, LLC assumed the mental health contract from Matrix in October 2003, due in part to Matrix's concerns about "spurious litigation" directed at their provision of mental health services within Defendants' facilities.

31. In March 2004 the Governor's Investigative team published a report on DOC in relation to seven untimely deaths of inmates over the prior 18 months, authored by Marks and McLaughlin. (Marks Report).

32. The Marks Report identified several areas of failure in the provision of mental health services pursuant to the contracts, including no quality assurance, no individual therapy and no staff training.

33. In April 2004, the State Auditor of Accounts released a report finding that the DOC had failed to require the mental health contractors to provide services required by the contract, including quality assurance programs, staff training programs, and staffing levels in each facility at specific times.

34. The Auditor's report asserts that more than $140,000 is likely owed to the State from the Defendant's contractors based on false and inaccurate billing procedures.

35. Defendants have policies and protocols regarding special considerations for placement of inmates with serious mental illness in segregation requiring input from mental health professionals prior to punishing these inmates for their illness related behavior. The Defendants routinely violate these policies.

36. On June 4, 2004 Plaintiff provided Defendants with the report of Dr. Craig

Vermont Protection
& Advocacy, Inc.
141 Main St.Suite 7
Montpelier, VT 05602

8

Van Tuinen (attached herein as Exhibit A) that contains the results of his review of various patient/inmate records and his conclusion of systemic and serious instances of substandard and harmful provision, or lack of provision, of mental health services. He specifically found the practice of punishing disabled inmates for their self-harming behavior unacceptable, counter-therapeutic and inconsistent with community standards of care.

37. Defendants have failed to provide Plaintiff with adequate assurances that changes identified by the Van Tuinen Report required to maintain an adequate standard of care for inmates with mental disabilities who commit acts of self-harm within DOC facilities will be implemented in an effective or timely manner in order to prevent the ongoing irreparable harm to this inmate population.

38. The established past and current policy of segregation of Plaintiff's constituents who engage in self-harming behavior is in violation of the Defendants' own stated policies and protocols, as well as the inmates' Constitutional rights to be free from cruel and unusual punishment, and is contrary to accepted standards of care, all of which constitutes harm capable of repetition yet evading review.

## GENERAL FACTUAL ALLEGATIONS

39. The conditions described in this Complaint result in gratuitous pain and suffering and pose an imminent danger of serious illness, injury or death to Plaintiff's constituency.

Vermont Protection
& Advocacy, Inc.
141 Main St.Suite 7
Montpelier, VT 05602

40. In imposing the conditions described in this Complaint despite the information referenced above demonstrating that their actions are contrary to accepted standards of mental health treatment, Defendants have acted with deliberate indifference to Plaintiff's constitutents' serious mental health and safety needs and to the risk that Plaintiff's constitutents' will suffer serious illness, injury or death.

41. The conditions described herein are not reasonably related to legitimate penological objectives or to any legitimate standard of medical treatment.

42. The conditions described in this Complaint are likely to persist or be repeated unless enjoined by this Court.

43. Plaintiff VP&A has spent substantial sums of money and resources attempting to obtain adequate mental health services and protections for its constituents, including spending time monitoring, investigating, reviewing records, filing formal grievances, following up on failures by the Defendants to adequately respond to grievances, and by filing litigation in both State and Federal Courts to obtain judicial intervention to protect the rights and welfare of its constituents.

<u>CAUSES OF ACTION</u>

<u>FIRST CAUSE OF ACTION</u>

<u>RIGHT TO FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT</u>

Vermont Protection
& Advocacy, Inc.
141 Main St.Suite 7
Montpelier, VT 05602

44. Plaintiff incorporates paragraphs 1 through 43, above.

45. By subjecting the Plaintiff's constituents to the conditions of confinement set forth herein, with full knowledge of those conditions, Defendants have acted, and continue to act, with deliberate indifference to Plaintiff's constituents' serious mental health and safety needs, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

46. By subjecting Plaintiff's constituents' to the pervasive inadequacies of the mental health care described herein, including punishing inmates with disabilities who self-harm, Defendants have acted, and continue to act, with deliberate indifference to Plaintiff's constituents' serious mental health and safety needs, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

47. By subjecting Plaintiff's constituents to the regime of excessive force, isolation, harassment, and environments known to exacerbate mental illness described herein, Defendants have acted, and continue to act, with deliberate indifference to Plaintiff's constituents' serious mental health and safety needs, and have violated the Eighth and Fourteenth Amendments to the United States Constitution.

48. Plaintiff's constituents continue to suffer the harmful consequences of the Defendants' unlawful actions in violation of their right to be free from cruel and unusual punishment pursuant to the Eighth and Fourteenth Amendments of the Constitution of the United States of America and there is no adequate remedy at law to protect them from this harm other than the instant Motion for Preliminary Injunctive relief and Complaint for Permanent Injunctive and

Vermont Protection
& Advocacy, Inc.
141 Main St.Suite 7
Montpelier, VT 05602

Declaratory relief.

### PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request that the Court:

1. Issue a Judgment declaring that the actions and omissions of Defendants when punishing mentally-ill inmates for their self-harming behaviors are unlawful and constitute cruel and unusual punishment under the Eighth and Fourteenth Amendment to the United States Constitution;

2. Permanently enjoin Defendants from subjecting prisoners with mental illness to the conditions described in the Complaint;

3. Grant Plaintiffs their reasonable attorney fees and costs;

4. Grant Plaintiffs any other relief as the Court deems just and proper.

Attorney for Plaintiff

_____
Arthur J. Ruben, Esq. (Fed.Bar ID# No. 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)
Vermont Protection & Advocacy
141 Main Street, Suite 7
Montpelier, VT 05602
(802) 229-1355

Ginny McGrath (Fed. Bar ID# No. 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)
Vermont Protection & Advocacy
141 Main Street, Suite 7
Montpelier, VT 05602

Vermont Protection
& Advocacy, Inc.
141 Main St.Suite 7
Montpelier, VT 05602

12

Exhibit "A"

**Craig Van Tuinen, M.D.**
P.O. Box 78
Waterbury, Vermont 05676
Phone/Fax (802) 244-1822

**May 20, 2004**

My name is Craig Van Tuinen, I have been a psychiatrist since 1985, licensed in Vermontt since 1988. I have provided mental health treatment and administrative oversight to mental health providers in a variety of settings, including instititutions such as the Vermont State Hospital and designated hospitals, community mental health offices, nursing homes, and privately. I have been hired by numerous parties, including the State of Vermont, Mental Health Law Project, and private attorneys for both plaintiffs and defendants, to provide opinions regarding the provision and adequacy of mental health services and have been an expert witness in both state and federal court approximately. 50 times. Over the past 15 months I have had the opportunity to focus on the mental health  treatment provided to inmates within the VT Department of Corrections' facilities. This focus has included DOC and other record reviews of at least five inmates with serious mental illness, at least three in-person visits and interviews with seriously mentally ill inmates within the DOC facilities, and extensive literature review and professional consultation activities.

Based on the foregoing experiences and evaluations, combined with other information available to the general public, such as the State Auditor's and the Marks/McLaughlin reports on DOC provision of mental health services, I have grave concerns that inmates with serious mental illness in DOC facilities are receiving inadequate and substandard mental health care at this time. My concerns fall into the following general categories: General professionalism of mental health providers and the use of punishment and deterrence mechanisms to moderate behavior of seriously mentally ill patients/inmates.

## Concerns regarding professionalism of mental health providers

**a. No Appropriate Therapy**

The five inmates whose records I have reviewed were clearly individuals with serious mental illness requiring the provision of mental health services and specifically therapy. There is no indication that the five inmates received any significant or ongoing therapy, with the possible exception of medications during the period of time reviewed. No group therapy, cognitive or behavioral therapy, or individual therapy (interpersonal, skill based, supportive, or other)

provided by DOC staff or contractors is documented in these inmates recent records.  In fact the infrequency and inconsistency of visits from mental health would not allow meaningful therapy to occur. If therapy were occurring the standard of care would be to document it in an understandable way and to note progress or lack of it to certain specific goals and make adjustments and changes as indicated. It appears that meetings with mental health staff simply involved management and administration. The failure of the DOC and its contractors to provide therapy to patient inmates who medically require such treatment appears endemic and is a serious and harmful violation of the standard of care in this area.

### b. Records not maintained to a professional standard

There are significant parts of the records that are unintelligible, most notably Bill Cote's, RNCS, and at times Dr. Otten's notes. Professional standards require that important information about a patient's treatment be documented in a manner that is accessible to other professionals, and this standard was not met in many of the records I reviewed.

### c. No appropriate medication oversight

The prescribing of medication appears to be left up to the nurse, Mr.

Cote, as Dr. Cotton's notes often appear to defer to Mr. Cote.

Discussions involving the care of specific patients, and specifically

medication, which should happen on a regular basis between the

medical doctor supervisor and the prescribing nurse practioner,

should be documented in the patient's chart. This writer did not see

evidence of this in the records he reviewed.  Thus, it appears that

medication is being prescribed and evaluated without adequate

guidance and supervision by someone other than the medical doctor

who is the most qualified and is the direct supervisor of the nurse

practitioner who cannot prescribe medication unless there is a

relationship to a medical doctor's license.

### d. Inappropriate discharge planning

Based on the records reviewed, it appears that discharge planning, a

critical aspect of effective mental health treatment, is carried out by

the responsible professionals in a counterproductive manner.

Records indicate staff will anticipate a discharge date by discussing it

with the inmate/patient but frequently the discharge does not happen.

This causes significant disruption to the therapeutic relationship and

process. It also adds a significant amount of stress and disruption to

the experience of the patient/inmate, often exacerbating their

symptoms. It appears that the resulting exacerbation of symptoms will often play an important role in further delaying discharge. This can lead to a "'vicious cycle" which is very detrimental to therapy and to the patients mental (as well as physical) health.

**e. Failure to appropriately respond to patient/inmate behaviors**

It appears from the records and investigation by this writer that problematic behavior of seriously mentally ill inmates is generally regarded by mental health staff as his being "bad."   There is little evidence that mental health staff worked with corrections staff to understand and respond therapeutically to these patients/inmates and to their inappropriate or challenging behaviors resulting from mental illness. Rather, records demonstrate that time and again mental health staff has supported the correctional staff's position that such behaviors require management and extinction, if possible, through punishment and coercive force. This approach is completely contrary to appropriate treatment and creates serious questions regarding the independence and professional judgment of individuals charged with providing mental health services to the inmate population. Punishment is not acceptable as a form of treatment and thus it is outside the standard of care. Yet mental health staff appears to condone the use of punishment in response to behaviors arising from mental illness (lock-ins, loss of good

time, extension of time in prison, loss of privileges, education and activities, etc.). This problem is of extreme concern because it is inconsistent with acceptable standards of mental health care, creates increased risks of harm to the patient/inmate, and has seriously adverse effects on the ability to provide treatment presently and in the future.  Yet these behaviors by mental health staff are pervasive in the records reviewed by this writer.

**f. Failure to effectively prevent re-traumatization**

This writer's investigation revealed that mental health staffs do not appear to play an active role in the appropriate use of restraints or developing alternatives that might decrease the frequency that they are needed for seriously mentally-ill inmates.  This failure has certainly resulted in inappropriate and counter-therapeutic use of punishment and restraints to the individuals whose records this writer reviewed.  When an institution is unable to provide safe or adequate treatment of individuals in their care or custody it is incumbent upon the mental health professional to determine where that individual can receive the treatment they need and make arrangements to move them to an appropriate location to receive it. This is the standard of care. This is as true for mental health issues as it is for surgery or other medical treatment. Despite clearly not being able to keep some inmates safe, and despite being unable (or unwilling) to provide them

6

with adequate treatment, the seriously mentally ill inmates whose records
have been reviewed were not transferred to a place capable of providing
them with the safety and treatment they needed. In most of these cases there
is no indication that transfer was discussed or explored.

### g. Failure to monitor therapeutic relationship

The failure generally of mental health providers to intervene when a
seriously mentally ill inmate is punished, to maintain adequate and regular
therapeutic contact with the patients/inmates, to counsel and supervise DOC
staff in how to understand and work with mentally-ill individuals, and to
assure that inmates who are unresponsive to efforts to stabilize their
behavior are transferred to a more appropriate environment, all detract from
the maintenance of an appropriate treatment relationship and demonstrate
that the DOC mental health system is failing to provide adequate mental
health care to the seriously mentally-ill individuals within its custody.
These substandard practices have resulted, and continue to result in, serious,
irreparable physical and psychological harm to this population of inmate.

It appears from the record that a casual attitude towards the mental illness of
prisoners contributed to a fairly consistent pattern of neither assessing and
treating their mental illness nor attempting to help them control the signs

and symptoms of their illness. Unfortunately the records do not indicate how the patient was viewed and understood except for the diagnosis they were given. The record does not give any clear indication of what treatment, if any, was given or attempted. It appears that the involvement of mental health is generally sporadic and largely triggered by requests from other staff (medical or corrections). Involvement of mental health appeared limited to trying to get the patient in line with prison life. As a result gaps between visits by mental health staff are much too long given the severity of the individuals' illness and needs. The standard of care for a seriously mentally ill patient/inmate requires visits on a daily basis when they are on special checks (suicide watch) and more often when in restraints or in a "strip cell." When there is no crisis there should still be visits made according to a clear and known schedule that DOC and medical staff or the patient can refer to. This schedule must specify which staff member will be present as well as the time and duration of their visit. Staff members are not interchangeable in the ongoing treatment process, this is a personal relationship and much of the power of the treatment is drawn from the patient/provider relationship. Mental health staff appears to accept the coercive and punitive qualities of prison life and its disruptions. In the process they appear to be giving up on what should be there primary

responsibility: the health and well-being of the individuals entrusted to their care.

## Use of punishment and restraints

As discussed above, the pervasive use of force, restraints and punishment in response to behaviors associated with the patient/inmates' illness is of grave concern to this writer and demonstrates that inadequate care is being provided to inmates with serious mental illness. The records reviewed demonstrate that the system punishes those individuals with mental illness who are least able to handle the stresses of prison by punishing the behaviors that result from their vulnerability with longer prison time, more isolation, physical restriction and disruption.  Prison is well recognized as a very stressful experience for any individual. Obviously those individuals with serious mental illness would be at high risk for serious alterations in their mood, thoughts and behaviors, yet no effort is documented in any of the records reviewed to take this obvious situation into account and plan or act to mitigate the vicious cycle identified in these records.   Just as obvious is the

fact that patient/inmates with serious mental illness will be very

effected by punishment, yet no record indicates adequate efforts were

made to mitigate the negative mental health effects of the

punishments.

Using punishment is not only contraindicated and unacceptable in

psychiatric care, it clearly falls outside the realm of acceptable medical

practice. Punishment engenders anger and resentment through the use of

hurt, pain, and fear. This is incompatible with the development of a

therapeutic relationship that is necessary for therapy and healing to occur. In

healthier individuals punishment may curb behavior at least temporarily, but

in individuals that are suffering from mental illness, the fear and anxiety is

often too great to be contained and the result is the self-injurious behavior

similar to what is seen in the four individuals reviewed.

The records reviewed are full of accounts of patient/inmates being punished

for self-harming behavior. Often the punishment is to isolate the individual

for days at time, depriving them of the contact and support that is the

standard of care in response to a self-harming individual.  The DOC policy

of punishing self-harming patient/inmates is contrary to accepted treatment

standards and the acquiescence to this policy by those responsible for provision of mental health care is simply malpractice on their part.

The records reviewed demonstrated that mental health professionals approved of the practice of holding seriously mentally ill naked in their isolation cells, ostensibly as a way of protecting them from harm. The practice of keeping an individual nude as a way to protect them is not an acceptable practice in mental health treatment. Such a practice is not used in hospital settings (it is not used at VSH). It is demeaning and dehumanizing and further exacerbates the shame and damaged self image that underlie borderline personality disorders as well as other disorders present in the inmates whose records were reviewed by this writer. Medical experience and literature demonstrates that treating individuals in such a way only perpetuates and exacerbates their disorder. The principal of respect in the treatment of individuals with psychiatric illness is fundamental. It is critical to successful treatment and without question an important standard of care. The practices described above do not provide the patient/inmate with any evidence that their illness or well-being is a priority for the mental health professionals assigned to provide their care. Hard restraints are cruel, more dangerous, and less protective than soft

restraints. Soft restraints are used at Vermont State Hospital and other hospitals to keep patients safe and are adequate for this purpose. Also the regulations and guidelines regarding the use of restraints are quite clear and designed to keep the patient safe and to cause the least amount of trauma to the patient as possible and they are closely followed. The use of staff to provide a more therapeutic environment is a critical factor that is utilized. The use of restraints documented in the record appears to be a far cry from how they are used at VSH and other hospitals. I reviewed the guidelines from the Department of Corrections Policy and Protocols recorded in the grievance. These appear somewhat more lenient than what is typical in hospitals (where physicians have a greater role and where there is ongoing monitoring by someone with medical and mental health training). Despite this greater leniency, the use of restraints would be much closer to the standard of care if the guidelines were followed. It appears, as documented in the grievance, that the guidelines were virtually ignored and largely not implemented. Their use, as documented in the grievance (and the record), includes some egregious violations of even the most minimal standard of care. There appears to be far less therapy and far more trauma involved in their use at the prison. The way they are used at the prison would never be tolerated at a hospital and would have serious ramifications for the hospital

if they were used in such a way.

The duration of the restraints was frequently not documented in the records reviewed. The documentation of orders for and supervision of the use of restraints was often not done and when done, was always incomplete. The failure to keep appropriate records of the orders and supervision of restraints leads to the conclusion that the authorizations and supervision did not exist. Such a failure to provide supervision and document the order and basis for restraining a patient/inmate is wholly below the standard of care related to the use of restraints on a seriously mentally-ill individual.

The access to objects used for self injury was clearly not adequately prevented which put the patient/inmates' life at risk as well as putting them at risk of serious and irreparable harm. The question of officers participating (either actively or passively) in helping the patient access these objects must be raised based on the circumstances reported in the records reviewed.

**Conclusion**

Overall, this writer's review of the records and experiences of the four seriously mentally-ill inmates confirms allegations made by advocacy

groups that mental health services for seriously mentally-ill inmates with self-harming and other problematic behavioral manifestations are below the standard of care required by professional mental health providers. The consistent theme of the records reviewed was that the patient/inmates should have controlled their own behavior and should be punished when they are unable to conform their behavior to required norms, despite the fact that their illnesses were mostly untreated and they were provided with unstable, aversive and inconsistent medical/mental health treatment. This perspective evidenced on the part of the DOC and its' mental health providers is so contrary to accepted standards of psychiatry and mental health treatment as to fall far below acceptable. In fact, the circumstances discussed above demonstrate to this writer that currently any seriously mentally ill inmate in DOC facilities is likely receiving similar treatment and is suffering irreparable psychological and potentially life threatening harm.

Respectfully submitted,

Craig Van Tuinen, M.D.