U.S. DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
2005 MAY 6 PM 4 38
CLERK
DEPUTY CLERK

| | |
|---|---|
| Vermont Protection and Advocacy, Inc. ) | |
| Plaintiff, ) | |
| ) | Docket No. 2:04-CV-245 |
| v. ) | |
| ) | |
| Robert Hofmann, et al. ) | |
| Defendant. ) | |

## AFFIDAVIT OF PAUL COTTON, M.D.

NOW COMES Paul Cotton, M.D. being duly sworn an hereby deposes and states as follows:

1. I am a licensed psychiatrist who provides mental health care to inmates committed to the Vermont Department of Corrections.
2. I am board certified by the American Board of Neurology and Psychiatry in Psychiatry and Forensic psychiatry.
3. I am familiar with inmate B.C. who is currently incarcerated at the Southern State Correctional facility. I provide oversight of B.C.'s mental health treatment and am responsible for his medication management.
4. I have reviewed the affidavit of Dr. Van Tuinen and disagree with his assessment that B.C. is not receiving adequate treatment. I further disagree with Dr. Van Tuinen's opinion that it is not possible for B.C. to receive treatment in his present setting.
5. According to Dr. Van Tuinen, having B.C. in seclusion does not do anything to treat his mental illness. I disagree with this position. Having B.C. in closed custody reinforces the position that he take responsibility for his own conduct. This approach is consistent with good psychiatric care and is used throughout the State for offenders with similar diagnosis. B.C. has progressed with this treatment and continues to exhibit less volatile behavior.
6. As part of B.C.'s treatment plan he is placed in the closed custody unit in response to his inappropriate and disruptive behavior. B.C. has progressed from being in closed custody and is presently in the general population.
7. I agree with Dr. Van Tuinen's diagnosis as set out in ¶ 3 of his affidavit with two exceptions. First I am doubtful that B.C. suffers from Psychosis and second I would add a diagnosis of Borderline Personality Disorder.
8. B.C.'s self harming actions are consistent with the diagnosis of Borderline Personality Disorder. He is monitored closely by corrections staff as well as mental health providers.
9. Since his incarceration in January, 2005, B.C. has been seen by myself as well as other mental health providers on at least 75 occasions.
10. B.C.'s current incarceration began on January 5, 2005 when he was brought back to Southern State Correctional Facility on a parole board violation.

11. I met with B.C. on January 11, 2005 and determined that he has a history of mental illness.
12. B.C. expressed a desire to be placed at the Windham Center. The Windham Center is an inpatient mental health center operated by the Springfield Hospital.
13. Representatives from the Windham Center came to SSCF to evaluate B.C. on January 19, 2005.
14. It was the determination of the Windham Center that B.C. was not appropriate for treatment at their hospital. This was due to their uncertainty that B.C. would behave in the hospital, and the fact that treatment there would not be able to address the personality disorders that are central to his condition. The Windham Center also believed that B.C. would be unduly disruptive to its other patients.
15. It was determined that the best placement for B.C. was the Bravo Unit at SSCF.
16. The Bravo Unit is the mental health unit at SSCF. In the Bravo Unit, inmates are seen weekly by mental health providers. Inmates in the Bravo Unit reside in single cells. Inmates in the Bravo Unit are subject to the same rules and regulations as those in general population.
17. Shortly after his being placed in Bravo Unit, B.C. was disruptive and interfering with the mental health treatment of other mentally ill inmates.
18. It was determined that B.C. should be moved to general population housing. However B.C. resisted such change and so he was moved to the Alpha Unit.
19. The Alpha Unit is a segregation unit at SSCF where inmates are generally confined to their cells for 23 hours a day.
20. After approximately two weeks in the Alpha Unit, I met with B.C. on February 11, 2005.
21. On February 11, 2005, B.C. advised me that he wished to move to the Bravo Unit. B.C. was still having difficulty accepting responsibility for his actions.
22. On February 15, 2005, I met with B.C. again and he told me that he was ready to move back to the general population unit.
23. The next day, B.C. changed his mind and advised a mental health provider that he wished to be transferred to the Bravo Unit.
24. I determined that he could be moved back to the Bravo Unit at that time.
25. On March 21, 2005, B.C. had an incident with another inmate in the Bravo Unit and was transferred back to the Alpha Unit.
26. B.C. remained in the Alpha Unit from March 21, 2005 through March 31, 2005.
27. By March 31, 2005, B.C.'s behavior was improving and the Mental Health treatment team determined a course of treatment by which B.C. could ease back to the Bravo Unit.
28. The Department allowed B.C. to have two cell beds – one in the Alpha Unit and one in the Bravo Unit even though this decreased the Department's housing capacity.

29. The plan of action called for B.C. to spend an increasing number of hours in the Bravo Unit during the day, and when not in Bravo, return to his cell in the Alpha Unit.
30. Initially, B.C. was to go to the Bravo Unit for one hour a day. By April 5, 2005, he was visiting Bravo up to three hours per day.
31. Over the next three weeks, B.C. continued to visit the Bravo Unit with the hours increasing over that time. He is moved towards a situation where he would spend his days in Bravo and only sleep in Alpha.
32. B.C.'s behavior during this time was appropriate in the Bravo Unit. B.C. acknowledged that he was "not totally innocent" with respect to his disruptive behavior.
33. On April 26, 2005, I met with B.C. along with Department caseworker Macy Holmquist. Holmquist is the caseworker assigned to the Bravo Unit. We informed B.C. if he continued his reasonable behavior, then on May 3, 2005, he would be re-evaluated for a full return to the Bravo Unit.
34. B.C. became angry and agitated and displayed explosive behavior. He verbally abused caseworker Holmquist with sexual and vulgar language.
35. Following B.C.'s explosion at caseworker Holmquist and myself, I determined that B.C. could not return to the Bravo Unit. From April 26, 2005 to April 29, 2005, B.C. was housed in the Alpha Unit without being allowed to go to Bravo.
36. The Motion for Temporary Restraining Order's ¶ 4 assertion that B.C was held in segregation for 38 days starting on March 21, 2005 is not wholly correct. From March 31, 2005 through April 26, 2005, B.C was not locked in 23 hours a day. Instead he was allowed out of the Alpha Unit and spent increasing hours in the Bravo Unit. It was during this time that the Department had two beds reserved for B.C.
37. Between March 31, 2005 and April 26, 2005, B.C. was assigned to both Alpha and Bravo. During this period of time, B.C. was allowed to go into Bravo during the day with hours increasing over time when his conduct improved. B.C.'s conduct improved over time and eventually in Bravo during the day and was only in Alpha to sleep.
38. On April 29, 2005, B.C.'s behavior had improved and he was moved to general population.
39. On May 1, 2005, B.C. was returned to the Alpha Unit for disruptive behavior.
40. By May 3, 2005, his behavior had improved and he was returned to general population on May 4, 2005.
41. In general population, B.C. is seen by mental health providers at least once per week.
42. As of this date, B.C. remains in general population.
43. B.C.'s present course of treatment is consistent with prevailing medical standards and he is not presently at imminent risk or danger.
44. I plan to see B.C. again on Tuesday May 10, 2005.
45. The facts recited herein are based on my personal knowledge and, so far as I rely on that knowledge, I believe them to be true.

DATED this 6th day of May 2005.

_____
Paul Cotton, M.D.

Subscribed and sworn to before me
This 6th day of May 2005.

_____
Notary Public